**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

DRITAN DUKA,                          :
                                      :
                                      :
            Petitioner,,              :      Civ. No. 13-3664 (RBK)
                                      :
      v.                              :      **OPINION**
                                      :
UNITED STATES OF AMERICA,             :
                                      :
            Respondent.               :
_____ :


_____

SHAIN DUKA,                           :
                                      :
                                      :
            Petitioner,,              :      Civ. No. 13-3665 (RBK)
                                      :
      v.                              :      **OPINION**
                                      :
UNITED STATES OF AMERICA,             :
                                      :
            Respondent.               :
_____ :


_____

ELJVIR DUKA,                          :
                                      :
                                      :
            Petitioner,,              :      Civ. No. 13-3666 (RBK)
                                      :
      v.                              :      **OPINION**
                                      :
UNITED STATES OF AMERICA,             :
                                      :
            Respondent.               :
_____ :

**ROBERT B. KUGLER, U.S.D.J.**

## I.   INTRODUCTION

Petitioners Dritan Duka, Shain Duka and Eljvir Duka (collectively referred to as the "Dukas" in this Opinion), seek relief through counsel under 28 U.S.C. § 2255 from their federal convictions and sentences.[1] The Dukas were convicted after a jury trial (along with their co-conspirators Mohamed Shnewer and Serdar Tatar) of conspiracy to murder members of the United States military amongst other charges. The Dukas raise seven ineffective assistance of counsel claims in their motions; specifically:  (1) denial of their right to testify ("Claim I"); (2) failure to request a jury instruction on the First Amendment ("Claim II"); (3) failure to object to expert testimony ("Claim III"); (4) failure to move for voir dire after a juror reaction to a video played at trial ("Claim IV"); (5) appellate counsel's failure to argue that a conversation was admissible under Federal Rule of Evidence 803(3) ("Claim V"); (6) failure to request a hearing on a missing recording ("Claim VI"); and (7) failure to introduce a video recording ("Claim VII"). The government has filed an opposition which asserts that the claims should be denied on the merits. For the following reasons, the Court will order an evidentiary hearing on Claim I, but will deny relief on the remaining claims the Dukas have raised.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

> Shnewer, the Duka brothers, and Tatar are a group of young men who lived in New Jersey and developed an interest in violent jihad, particularly attacks against the United States military. Defendants, who had known each other since high school, came to the FBI's attention after it received a copy of a video that was brought to a Circuit City store in Mt. Laurel, New Jersey for copying. The video dated from January 2006 and depicted the five defendants

---

[1] Mohamad Ibrahim Shnewer and Serdar Tartar, who were co-defendants with the Dukas at trial, are also separately pursuing a *pro se* collateral attack on their federal judgment, conviction and sentence pursuant to 28 U.S. § 2255. Their § 2255 motions are not the subject of this Opinion and will be analyzed separately in due course.

and others at a firing range in the Pocono Mountains, shooting weapons and shouting "Allah Akbar!" and "jihad in the States."

Over the course of the next sixteen months, the FBI deployed two cooperating witnesses, Mahmoud Omar and Besnik Bakalli, to monitor defendants' activities. The evidence presented at trial showed that, between January 2006 and May 2007, defendants viewed and shared videos of violent jihadist activities, including beheadings, around the world; they viewed and shared videos of lectures advocating violent jihad against non-Muslims; they sought to acquire numerous weapons, including automatic firearms and rocket-propelled grenades; they returned to the Poconos, where they again engaged in shooting practice; they discussed plans to attack the United States military; they conducted research and surveillance on various potential targets for such an attack in New Jersey, Pennsylvania, and Delaware; and they procured a map of the United States Army Base at Fort Dix to use in planning and coordinating such an attack.

With respect to the individual defendants, the evidence demonstrated the following:

Mohamad Shnewer is a naturalized American citizen who was born in Jordan. He admired and sought to emulate the "nineteen brothers," i.e., the September 11 hijackers, Osama bin Laden, and the leader of Al Qaeda in Iraq, Abu Musab al-Zarqawi. Shnewer openly discussed and planned attacks on military targets in New Jersey, Pennsylvania, and Delaware. Along with Omar, the government informant, he staked out the United States Army Base at Fort Dix, McGuire Air Force Base, Lakehurst Naval Air Station, and the United States Army Base at Fort Monmouth in New Jersey; the United States Coast Guard Base in Philadelphia, Pennsylvania; and Dover Air Force Base in Delaware. Shnewer also considered attacking the federal government building at 6th and Arch Streets in Philadelphia and drove by the building to determine whether such an attack would be feasible. To accomplish an attack on these targets, Shnewer proposed deploying a gas tanker truck as a bomb, using roadside bombs or surface-to-air missiles, and spraying military targets with machinegun fire. He sought to acquire AK-47 machineguns from Omar to use in such an attack.

Dritan, Shain, and Eljvir Duka are brothers who were born in Albania. During the events that were the subject of the trial, they were in the United States illegally. In 2006 and 2007, the Dukas took at least two trips to the Poconos to train for jihad by firing

weapons, attempting to buy automatic weapons, discussing jihad, and watching violent jihadist videos. The Dukas befriended government informant Bakalli, a fellow Albanian, and encouraged him to join them in avenging Muslims who had been oppressed in the United States and Israel. They viewed and praised a lecture, *Constants on the Path to Jihad*, by Anwar al-Awlaki, the prominent cleric and proponent of attacks against the United States military, and videos depicting attacks on American soldiers by violent jihadists in Iraq and elsewhere. In recorded conversations presented at trial, the Dukas described beheadings depicted in the videos as just punishment for traitors. The Dukas watched the beheading videos over and over again until they became inured to the spectacle. Dritan told Bakalli that, although at first he "couldn't take it," "[n]ow I see it and it's nothing, I do not care. I saw hundreds being beheaded." Similarly, Eljvir told Bakalli that the beheadings were difficult to watch at first, but that "[n]ow we can watch it no problem."

Like Shnewer, the Dukas sought to acquire firearms to further their plans. They could not acquire weapons lawfully because they were in the country illegally, so they turned to the black market. By January 2007, the three brothers told Bakalli they had acquired a shotgun, two semi-automatic rifles, and a pistol, and they continued to look for opportunities to buy machineguns.

Later that spring, Dritan Duka ordered nine fully automatic weapons – AK 47s and M-16s – from a contact of Omar in Baltimore. The FBI arranged a controlled transaction, and, on May 7, 2007, Dritan and Shain Duka went to Omar's apartment to retrieve their weapons. After handing Omar $1,400 in cash, Dritan and Shain examined and handled four fully automatic machineguns and three semiautomatic assault rifles. They asked Omar for garbage bags to conceal the weapons (so they would look like golf clubs) as they carried them out to the car. Before they could get there, however, federal and state law enforcement officers entered Omar's apartment and arrested them. The entire transaction was captured on video by equipment installed in Omar's apartment by the FBI and was shown to the jury at trial.

Serdar Tatar is a lawful permanent resident in the United States who was born in Turkey. Tatar appears in the video of defendants' January 2006 training trip to the Poconos. After extensive discussions with Omar about Shnewer's plan to attack Fort Dix, Tatar agreed to help by providing Omar with a map of Fort Dix to use in planning such an attack. Regarding the overall plan to attack

> Fort Dix, Tatar told Omar in a recorded conversation, "I'm in, honestly, I'm in."
>
> All five defendants were arrested on May 7, 2007, after Dritan and Shain Duka completed the controlled firearm purchase from Omar.

*United States v. Duka*, 671 F.3d 329, 333-35 (3d Cir. 2011).

Relevant to this Opinion, the Dukas were charged with: (1) conspiracy to murder members of the United States military in violation of 18 U.S.C. §§ 1114 & 1117 ("Count I"); (2) attempt to murder members of the United States military in violation of 18 U.S.C. § 1114 ("Count II"); (3) possession or attempted possession of firearms in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) and 924(c)(1)(B)(ii) ("Count III"); and (4) possession of firearms by an illegal alien in violation of 18 U.S.C. § 922(g)(5) ("Count VII"). Additionally, Dritan and Shain Duka were charged with possession of machineguns in violation of 18 U.S.C. § 922(o). The Dukas pled not guilty and went to trial. A jury found Dritan and Shain Duka guilty of the following: (1) conspiracy to murder members of the United States military, (2) possession or attempted possession of firearms in furtherance of a crime of violence; (3) possession of machineguns; and (4) possession of firearms by an illegal alien. Both Dritan and Shain Duka received a life sentence. Eljvir Duka was convicted by a jury of conspiracy to murder members of the United States military and possession of firearms by an illegal alien. He was also sentenced to life imprisonment. The jury found the Dukas not guilty of attempt to murder members of the United States military and found Eljvir Duka not guilty of Count III. The United States Court of Appeals for the Third Circuit affirmed the judgment and conviction as to the Dukas on December 28, 2011. *See Duka*, 671 F.3d 329.

The Dukas jointly filed a counseled § 2255 motion raising several claims.[2]  The government has filed a response in opposition and the Dukas have filed a joint reply.[3]

### III.    LEGAL STANDARD FOR § 2255 MOTION

A motion to vacate, set aside or correct a sentence of a person in federal custody pursuant to 28 U.S.C. § 2255 entitles a prisoner to relief if "the court finds . . .  [t]here has been such a denial or infringement of the constitutional rights of the prisoner as to render judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). "In considering a motion to vacate a defendant's sentence, 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous based on the existing record.'" *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (quoting *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)) (citing R. Governing § 2255 Cases R. 4(b)). A District Court "is required to hold an evidentiary hearing 'unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *Forte*, 865 F.2d at 62). The Third Circuit has stated that this standard creates a "'reasonably low threshold for habeas petitioners to meet.'" *Id.* (quoting *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005) (quoting *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001))). Accordingly, this Court abuses its discretion "if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief." *Id.* (citing *McCoy*, 410 F.3d at 134).

---

[2] The Dukas filed a joint memorandum of law when they were all represented by Robert Boyle, Esq. However, Dritan Duka is now represented by Chad Lathrop Edgar, Esq. and Eljvir Duka is represented by Charles D. Swift, Esq. Shain Duka remains represented by Mr. Boyle.

[3] The Dukas have an outstanding motion for leave to file an oversize reply brief which will be granted.

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

All of the Dukas' claims implicate whether they received ineffective assistance of counsel. The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim in light of all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697). Additionally, "claims of ineffective assistance of appellate counsel are also governed by the *Strickland* standard." *Lusick v. Palakovich*, 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000)).

## V.      DISCUSSION

### A.  Claim I – Denied Right to Testify

The Dukas collectively claim that their decision not to testify was the result of attorney coercion. A defendant has the constitutional right to testify on his own behalf at trial. *See Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987). "The right is personal and can be waived only by the

defendant, not defense counsel." *Unites States v. Leggett*, 162 F.3d 237, 245 (3d Cir. 1998) (citations omitted). "If a defendant does waive this right, the waiver must be knowing, voluntary and intelligent." *Id.* (citations omitted). Where a petitioner claims that his attorney was ineffective by denying him the right to testify, the *Strickland* standard is used to analyze the claim. *See Palmer v. Hendricks*, 592 F.3d 386, 394 (3d Cir. 2010) (citations omitted).

The Dukas did not testify at trial. However, the Dukas claim that they did not voluntarily waive the right to testify at their trial because their decision was the product of coercion. Shain Duka filed a declaration whereby he states that he told his attorney, Mr. Michael Riley, Esq., before and during his trial that he wanted to testify. However, near the end of the trial, Shain Duka recalls that the attorneys that represented him and his brothers told them that "not only should [they] not testify, they were not prepared to put any of [them] on the stand." (*See* Dkt. No. 14 at p. 6.)[4] Shain Duka also declares that [h]ad I thought that my lawyer was prepared, I would have insisted on taking the witness stand[.]" (*Id.*)

Eljvir Duka's filed declaration is even more specific than Shain's as he states as follows:

> After the government rested its case, there was a meeting in the courthouse attended by my co-defendants and all the lawyers. I stated that I wished to testify. Mr. Archie [Eljvir's trial counsel] stated that I should not and that in any event he was not prepared to put me on the stand. I still wished to testify and told Mr. Archie so. However, over the course of the meeting, I came to the conclusion that Mr. Archie was not prepared and because of that I would probably hurt my chances if I testified. It is for that reason that I told the Court that I decided not to testify.

(Dkt. No. 15 at p. 1.) Dritan Duka also recounts the purported coercion he felt from his counsel not to testify:

> It was between 3-6 months before the start of trial that I told my attorney Michael Huff that I wanted to testify. He initially was not

---

[4] Unless otherwise specified, citations to Docket Numbers refers to Docket Numbers found in Civil No. 13-3664.

opposed. However, during a legal visit some time prior to trial, he asked me some more questions that may be posed on cross examination. I do not recall specific questions only that they concerned my belief in a Muslim's jihad obligation. Mr. Huff told me that based on my answers the jury would likely think I was an extremist and convict me. At the conclusion of that meeting I had not changed my mind and still wanted to testify.

We did not discuss the issue of my testimony again until after the Government concluded its case. I recall a meeting where all of the defendants and lawyers were present. Mr. Huff told me that I should not testify. I stated that I still wanted to do so. He added that he was not prepared to put me on the stand and that if I took the stand it would hurt the case.

I only agreed with his decision because he told me that he was not prepared and I felt that if he was unprepared my taking the stand would do more harm than good. It was for that reason that I told the Court that I chose not to testify.

Mr. Huff never informed me, nor was I aware that I could have overruled his decision and testified even if he thought it was a bad idea. Had I known that I would have as [sic] asserted that right and requested that Mr. Huff request some time to prepare me.

(Dkt. No. 16 at p. 9.) In addition to discussing the purported coercion each Duka brother felt, each discusses in their declarations what they would have testified to if they took the stand at their trial to varying degrees. The Dukas assert that their respective counsel's statements that they were unprepared to present their testimony at trial was coercive so as to make their decision not to testify unknowing, involuntary and unintelligent.

The government responds in opposition to this claim by initially citing to this Court's colloquy it had with the Dukas at trial regarding their right to testify. The government argues that the Dukas have now contradicted the assurances they gave the Court during trial regarding giving up their right to testify. It further claims that the Dukas provide no explanation why their attorneys would undertake such grievous professional misconduct. In support of its position, the government has attached the declarations of the Dukas' trial counsel. These three attorneys all

state that they informed the Dukas of their right to testify and that they never told them that they were unprepared to place them on the witness stand.

At this stage of the proceedings, the record and files do not conclusively show that the Dukas are not entitled to federal habeas relief on this claim. Therefore, an evidentiary hearing on this claim will be ordered.

The parties dispute whether it is necessary to have the Dukas present at the evidentiary hearing. The government requests that the Court take evidence from the Dukas' three trial attorneys about their purported prevention of the brothers from testifying due to their lack of preparation. The Dukas' respective § 2255 attorneys could then cross-examine the three attorneys without the presence of the Dukas. Under the government's proposal, the Court could then presumably conclude that this claim could be decided without the need for the Dukas to testify, which would, according to the government, "avoid the costs and delay of transporting Petitioners from distant locations to Camden." (Dkt. No. 31 at p. 30.)

The Dukas argue that fundamental fairness dictate that they be produced in court for the evidentiary hearing. They claim that this Court will need to evaluate each witness' credibility. Furthermore, the Dukas assert that they should be present in court for the evidentiary hearing so that they can communicate with their respective § 2255 counsel and consult with them with respect to their cross-examination of their trial attorneys.

The Court finds that the Dukas should be made available in Court for their individual § 2255 hearings as this Court may need to judge the credibility of the Dukas compared to their respective trial counsel. Each Duka brother shall have his own separate evidentiary hearing. The Court will advise the parties on the dates and times of the evidentiary hearings in the near future.

B.  <u>Claim II – Failure to Request First Amendment Jury Instruction</u>

In Claim II, the Dukas claim that their trial counsel was ineffective for failing to request a

First Amendment jury instruction. They claim that the gravamen of their defense was that "while

they may have believed that violent jihad was a religious obligation and may have even

advocated that point of view to others, they never agreed to take any action." (Dkt. No. 13 at p.

47.) They claim that having embraced that defense, counsel should have requested an instruction

that they could not be convicted of the conspiracy on the basis of protected speech. (*See id.*) The

Dukas give a suggested example of an instruction that should have been requested by counsel:

> The First Amendment protects speech that encourages others to
> commit violence, unless the speech is capable of producing
> imminent lawless action. Speech that makes future violence more
> likely, such as advocating for illegal action at some indefinite time
> in the future, is protected. Thus, speech may not be punished just
> because it makes it more likely that someone will be harmed at
> some unknown time in the future.
>
> The First Amendment guarantees individuals the right to freely
> express their ideas regardless of the unpopularity of those ideas. It
> guarantees individuals the right to associate with others to advance
> collective beliefs and to pursue a wide variety of objectives,
> including but not limited to political, social, economic,
> educational, religious, and cultural goals.

(*Id.*)

As previously stated, a court can decide an ineffective assistance of counsel claim on

prejudice grounds, if it is easier to do so. *See Rainey*, 603 F.3d at 201. Thus, the Dukas must

show to a reasonable probability that the outcome of their trial would have been different had a

First Amendment jury instruction been given.

The Dukas fail to show that the outcome of their trial would have been different to a

reasonable probability as the proposed First Amendment instruction was unnecessary in light of

the other jury instructions. To illustrate why the First Amendment instruction would not have

changed the outcome of the trial to a reasonable probability, it is important to first reiterate the specific instructions that this Court did give for the jury's consideration in this case. On the count of conspiracy to murder United States military, this Court instructed the jury as follows:

It is a federal crime for two or more persons to agree or conspire to commit any offense against the United States even if they never actually achieve their objective. A conspiracy is a kind of criminal partnership. In order for you to find any of the defendants guilty of conspiracy to commit murder of members of the uniformed services of the United States, you must find the government proved beyond a reasonable doubt each of the following elements:

First. That two or more persons agreed to murder members of the uniformed services of the United States, as charged in the indictment. And I will explain the elements of murder of members of the uniformed services of the United States shortly.

Second. That the defendant you are considering knowingly and willfully joined the agreement or conspiracy knowing of its objective to murder members of the uniformed services of the United States.

And third. That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

I will now explain each of the elements in more detail.

The government is not required to prove that any of the members of the conspiracy were successful in achieving any or all of the objectives of the conspiracy. You may find the defendant you are considering guilty of conspiracy if you find that the government proved beyond a reasonable doubt the elements I've explained, even if you find the government did not prove that any of the conspirators actually committed any other offense against the United States. Conspiracy is a criminal offense separate from the offense that was the objective of the conspiracy. Conspiracy is complete without the commission of that offense.

A conspiracy ends when the objectives of the conspiracy have been achieved or when all members of the conspiracy have withdrawn from it. However, a conspiracy may be a continuing conspiracy; and if it is, it lasts until there is some affirmative showing that it has ended or that all its members have withdrawn. A conspiracy

may be a continuing one if the agreement includes an understanding that the conspiracy will continue over time. Also, a conspiracy may have a continuing purpose or objective and therefore may be a continuing conspiracy.

The first element of a crime of conspiracy is the existence of an agreement. The government must prove beyond a reasonable doubt that two or more persons knowingly and willfully arrived at a mutual understanding or an agreement, either spoken or unspoken, to work together to achieve the overall objective of the conspiracy, which is to murder members of the uniformed services of the United States. The government does not have to prove the existence of a formal or written agreement or an express oral agreement spelling out the details of the understanding. The government does not have to prove that all members of the conspiracy directly met or discussed between themselves their unlawful objective or agreed to all the details or agreed to what the means were by which the objective would be accomplished. The government is not even required to prove that all the people named in the indictment were in fact parties to the agreement, or that all members of the alleged conspiracy were named or that all members of the conspiracy are even known. The government does not have to prove that the full conspiracy existed between January 3, 2006, and May 7, 2007. The government only needs to prove beyond a reasonable doubt that the conspiracy existed at any time between January 3, 2006 and May 7, 2007.

What a government must prove beyond a reasonable doubt is that two or more persons in some way or manner arrived at a unity of purpose, that is, some type of agreement, mutual understanding or meeting of the minds to try to accomplish a common and unlawful objective.

I instruct you, however, that a government informant cannot be a co-conspirator, therefore there can be no conspiracy between one defendant and a government informant, that is, either Mahmoud Omar or Besnik Bakalli.

You may consider both direct evidence and circumstantial evidence in deciding whether the government has proved beyond a reasonable doubt that an agreement or mutual understanding existed. You may, but are not required, to find the existence of a conspiracy based on evidence of related facts and circumstances which prove the activities of the participants in a criminal venture could not have been carried out except as the result of a preconceived agreement, scheme or understanding.

If you find that a criminal agreement or conspiracy existed, then in order to find a particular defendant guilty of conspiracy, you must also find that the government proved beyond a reasonable doubt that the defendant you are considering knowingly and willfully joined that agreement or conspiracy during its existence. The government must prove the defendant you are considering knew the goal or objective of the agreement or conspiracy and voluntarily joined it during its existence intending to achieve the common goal or objective and to work together with the other alleged co-conspirators toward that goal or objective.

The government need not prove that the defendant you are considering knew everything about the conspiracy or that he knew everyone involved in it or that he was a member from the beginning. The government also does not have to prove that the defendant you are considering played a major or substantial role in the conspiracy. You may consider both direct evidence and circumstantial evidence in deciding whether the defendant you are considering joined the conspiracy, knew of its criminal objective, and intended to further the objective.

Evidence which shows the defendant you are considering only knew about the conspiracy or only kept bad company by associating with a member of the conspiracy or is only present when it was discussed or when a crime was committed is not sufficient to prove the defendant you are considering was a member of the conspiracy, even if the defendant you are considering approved what was happening or did not object to it. Likewise, evidence showing that the defendant you are considering may have done something that happened to help a conspiracy does not necessarily prove that he joined the conspiracy.

You may, however, consider this evidence with all the other evidence in deciding whether the government proved beyond a reasonable doubt that the defendant you are considering joined the conspiracy.

In order to find a particular defendant guilty of conspiracy, you must find that the government proved beyond a reasonable doubt that the defendant you are considering knowingly and willfully joined the conspiracy knowing of its objective and intending to help further or achieve that objective. That is, the government must prove:

One. The defendant you are considering knew of the objective or goal of the conspiracy.

Two. That the defendant you are considering joined the conspiracy intending to help further or achieve that goal or objective and;

Three. That the defendant you are considering and at least one other alleged conspirator shared a unity of purpose towards that objective or goal.

You may consider both direct evidence and circumstantial evidence, including the words, the conduct or lack of conduct, of the defendant you are considering and other facts and circumstances in deciding whether the defendant you are considering had the required knowledge and intent.

The offense of conspiracy to murder members of the United States uniform services charged in the indictment requires that the government prove the defendant you are considering acted knowingly with respect to the second element of the offense. This means the government must prove beyond a reasonable doubt that a particular defendant was conscious and aware of the nature of his actions and of the surrounding facts and circumstances as specified in the definition of the offense charged.

In deciding whether a particular defendant acted knowingly, you may consider evidence about what the defendant said, what he did and failed to do, how he acted and all the other facts and circumstances shown by the evidence that may prove what was in his mind at that time.

The requirement of acting knowingly applies to certain other counts in the indictment. When I instruct you that another count requires proof that the defendant acted knowingly, the definition of that term here applies to the other count as well.

The offense of conspiracy to murder members of the United States uniformed services charged in the indictment requires the government to prove that the defendants acted willfully with respect to the second element of the offense. This means the government must prove beyond a reasonable doubt that the defendant you are considering knew his conduct was unlawful and intended to do something that the law forbids, that is, to find a particular defendant acted willfully you must find that the defendant proved beyond a reasonable doubt that the defendant acted with a purpose to disobey or disregard the law. Willfully does not, however, require prove that a defendant had an evil motive or bad purpose other than the purpose to disobey or disregard the law.

Willfully does not require proof that the actor knew of the existence or meaning of the statute making his conduct criminal.

The requirement of acting willfully applies to certain other counts in the indictment. When I instruct you that another count requires proof that a defendant acted willfully, the definition of that term provided here applies to the other count as well.

Often, the state of mind with which a person acts at any given time cannot be proved directly because one cannot read another person's mind and tell what he or she is thinking. However, a defendant's state of mind can be proved indirectly from the surrounding circumstances. Thus, to determine a particular defendant's state of mind at a particular time, you may consider evidence about what the defendant said, what he did and failed to do, how he acted and all the other facets and circumstances shown by the evidence that may prove what was in the defendant's state of mind at that time. It's entirely up to you to decide what the evidence presented during this trail proves or fails to prove about a particular state of mind.

You may also consider the natural and probable consequences of any acts that a particular defendant knowingly did and whether it is reasonably to conclude that he intended those results or consequences. You may find, but are not required to find, that a particular defendant knew and intended the natural and probable consequences or results of acts he knowingly did. This means that if you find that an ordinary person in the defendant's situation would have naturally realized that certain consequences would result from his actions, then you may find, but you are not required to find, that the defendant did know and did intend that those consequences would result from his actions. This is entirely up to you to decide as the finders of fact in this case. Motive is not an element of the offense with which any defendants are charged. Proof of bad motive is not required to convict. Further, proof of bad motive alone does not establish that a defendant is guilty and proof of good motive alone does not establish that the defendant is not guilty. Evidence of a defendant's motive may however help you find the defendant's intent. Intent and motive are different concepts. Motive is what prompts a person to act. Intent refers only to the state of mind or to which the particular act is done. Personal advancement and financial gain for example are typical motives for much of human conduct. Here the Government claims that religious or political principles supplied the defendants with a motive to engage in this particular conduct. However, these

motives may prompt one person to intentionally do something perfectly acceptable, while prompting another person to intentionally do an act that is a crime. With regard to the fourth element conspiracy overt acts the government must prove beyond a reasonable doubt that during the existence of the conspiracy at least one member of the conspiracy performed at least one of the overt acts described in the indictment for the purpose of furthering or helping to achieve the objective of a conspiracy. The indictment alleges certain overt acts. The government does not have to prove all of these acts were committed or that any of these act were themselves illegal. Also the government does not have to prove that the defendant you are considering personally committed any of the overt acts. The government must prove beyond a reasonable doubt that at least one member of the conspiracy committed at least one of the overt acts as alleged in the indictment and committed it during the time the conspiracy existed for the purpose of furthering or helping to achieve the objective of the conspiracy. You must unanimously agree on which overt act or acts were committed.

Now the overt acts alleged in Count One of the indictment are as follows.

In or about the week of January 3rd, 2006 Mohamad Irbahim Shnewer, Dritan Duka, Eljvir Duka, Shain Duka and Serdar Tatar engaged in firearms training in Gouldsboro, Pennsylvania.
B. In or about the week of January 3, 2006, Serdar Tatar purchased the Moosberg shotgun in Pennsylvania.
C. On or about April 28, 2006, Mohamad Ibrahim Shnewer provided a DVD to cooperating witness one, that is Mahmoud Omar as cooperating witness one as you know and every time I refer to cooperating witness number one, I'm referring to Mahmoud Omar. An individual Shnewer believed shared his violent jihadist philosophy. The DVD upon which Shnewer had written DVD Islam displayed violent jihadist images as the narrator attempted to recruit the viewer to engage in jihadist activities.
D. On or about May 26, 2006, Mohamad Ibrahim Shnewer provided his laptop computer to Mahmoud Omar in order for Mahmoud Omar to view an Al-Qaeda recruitment video which featured among others Usama Bin Ladin and Sheikh Omar Abdal Rahman as well as a video which glorified the terrorist attacks of September 11, 2001.
E. On or about July 29, 2006, Mohamad Ibrahim Shnewer, cooperating witness two. Cooperating witness two is Besnik Bakalli. So every time you see cooperating witness two, that is

Besnik Bakalli. An individual Shnewer believed shared his violent jihadist philosophy videos depicting armed attacks of United States military personnel.

On or about August 1st, 2006 Serdar Tatar transferred his ownership of two weapons, namely the Moosberg shotgun and the Berretta rifle to a third party in order to prevent these weapons from being traced to Tatar or other members of the conspiracy.

G. On or about August 11, 2006, Mohamad Ibrahim Shnewer conducted surveillance of the United States Army base in Fort Dix, and McGuire Air Force Base.

H. On or about August 11th 2006, Mohamad Ibrahim Shnewer conducted surveillance of the United States Army base at Fort Monmouth.

I. On or about August 11, 2006, Mohamad Ibrahim Shnewer conducted surveillance of the Lakehurst Naval Air Station.

J. On or about August 13, 2006, Mohamad Ibrahim Shnewer conducted surveillance of the Dover Air Force Base.

K. On or about August 13, 2006, Mohamad Ibrahim Shnewer conducted surveillance of the United States Coast Guard Base in Philadelphia, Pennsylvania.

L. On or before November 28, 2006, Serdar Tatar acquired a map of the United States Army Base at Fort Dix labeled can Cantonment Area Fort Dix, New Jersey knowing the map was to be used by members of the conspiracy to plan and coordinate an attack on Fort Dix.

M. On or about November 28, 2006, Serdar Tatar provided the flap of Fort Dix to Mahmoud Omar indicating that the map be used by members of the conspiracy to plan and coordinate an attack on Fort Dix.

N. On or about December 3rd, 2006, Serdar Tatar cautioned Mohamad Ibrahim Shnewer against placing too much trust in Mahmoud Omar.

O. On or about December 7, 2006, Serdar Tatar falsely stated to law enforcement officers that he had never provided a map of Fort Dix to anyone.

P. On or about December 2, 2006, Mohamad Ibrahim Shnewer took possession of the map of Fort Dix from Mahmoud Omar and hid the flap map in a secret location.

Q. On or about January 31, 2007, Dritan Duka, Eljvir Duka and Shain Duka collected weapons including the Mossberg shotgun, the Beretta rifle, the Yugoslavian SKS semiautomatic rifle, and the Bretta pistol to be used during firearms training in Pennsylvania

R. On or about February 1st, 2007, Dritan Duka, Eljvir Duka and Shain Duka traveled by car from New Jersey to Pennsylvania to engaged in firearms training.

19

S. On or about February 2, 2007, Dritan Duka, Shain Duka and Eljvir Duka, engaged in firearms training in Gouldsboro, Pennsylvania

T. On or about February 4, 2007, Mohamad Ibrahim Shnewer traveled by car to Gouldsboro, Pennsylvania to engage in firearms training

U. Oh or about February 4, 2007, Mohamad Ibrahim Shnewer, Dritan Duka and Shain Duka viewed terrorist training DVDs and videos depicting, among other things, the death and dismemberment of United States military personnel.

V. On or about February 5, 2007, Mohamad Ibrahim Shnewer, Dritan Duka, Shain Duka and Eljvir Duka engaged in firearms training in Gouldsboro, Pennsylvania

W. On or about February 26, 2007, Dritan Duka and Eljvir Duka engaged in tactical training in Cherry Hill, New Jersey using paintball guns and equipment.

X. On or about March 15, 2007, Dritan Duka and Shain Duka engaged in tactical training in Cherry Hill, New Jersey using paintball guns and equipment.

Y. On oh about March 15th, 2007, Dritan Duka gave cooperating witness one Mahmoud Omar a business card on the back which Duka had written AK47 Kalishnikov a Russian made semiautomatic and/or fully automatic assault weapon indicating the type of weapons Duka wanted to acquire.

Z. On or about March 16, 2007, Mohamad Ibrahim Shnewer told Mahmoud Omar he wanted to purchase an AK47 semiautomatic and/or fully automatic assault weapon.

AA. On or about March 28, 2007, Dritan Duka reviewed a list of weapons which included AK47 Kalishnikov semiautomatic assault weapons and M-16 machine guns purported for sale by an individual believed to be a black market weapons dealer.

BB. On or about April 6, 2007, Dritan Duka agreed to purchase multiple AK47 Kalishnikov semiautomatic assault weapons, M16 fully automatic machine guns, and four handguns from an individual believed to be a black market weapons dealer

CC. On or about April 27, 2007, Mohamad Ibrahim Shnewer agreed to purchase an AK47 Kalishnikov semiautomatic assault weapons from an individual he believed to be a black market weapons dealer.

DD. On or about May 7, 2007, Dritan Duka and Shain Duka traveled to a location in Cherry, New Jersey to take possession of the three AK47 Kalishnikov semiautomatic assault weapons, the four M-16 fully automatic machine guns, and the four handguns ordered by Dritan Duka on April 6, 2007. . . .

As I stated earlier, the object or goal of the alleged conspiracy was the crime of murder of members of the uniformed services of the United States. Because the defendants are not charged with murder, and indeed because no murder was committed, the Government does not, of course, have to prove that the defendants committed any such murder. Nevertheless, in order for you to properly consider the change of conspiracy to murder members of the United States uniformed service, I must instruct you about the elements of that crime. The government is not required to prove these elements in this case, but the government is required to prove that each of the defendants entered into an agreement to commit that crime.

The crime of murder of members of the United States uniformed services has four elements.

One, the defendant unlawfully caused the death of one or more members of the uniformed services of the United States.

Two, the defendant did so with malice aforethought and not in the heat of passion.

Three, the killing or killings were premeditated

And, Four, the victim or victims were killed while engaged in his/her official duties or in account of the performance of his/her official duties as a member of the uniformed armed services of the United States.

The defendant does not have to know that the victim was a member of the uniformed services of the United States.

As used in the instructions, the term malice aforethought means either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life.

As used in these instructions the word premeditation means the planning or deliberation. The passage of time is a factor which you may consider in attempting to determine if a defendant acted with premeditation. The amount of time either needed for premeditation of a killing depend on the person and the circumstances. The time must be long enough after forming the intent to kill, however, for the killer to be fully conscious of the intent and to have considered the killing.  . . .

21

Evidence has been admitted in this case that certain defendants or other persons who are alleged to be co-conspirators of the defendants did or said certain things. The acts or statements of any member of a conspiracy are treated as the acts statements of all the members of the conspiracy, if these act or statements were performed or spoken during the existence of the conspiracy and to further the objectives of the conspiracy.

Therefore, you may have to consider as evidence against any of the defendants any acts done or statements made by any members of the conspiracy, during the existence of and to further the objectives of the conspiracy. You may consider these acts and statements even if they were done and made in a particular defendant's absence and without his knowledge. As with all the evidence presented in this case, it is for you to decide whether you believe this evidence and how much weight, if any, to give it.

Acts done or statements made by an alleged co-conspirator before a particular defendant joined the alleged conspiracy, may also be considered by you as evidence against that defendant. However, acts done or statements made before the alleged conspiracy began, or after it ended may only be considered by you as evidence against the person who performed that act or made that statement.

(Trial Tr. at p. 6301-18.)

As the above instructions indicate, the jury was instructed that to find the Dukas guilty, they had to find that the government had proven that the defendant knew of the objective goal of the conspiracy. The jury was further instructed that the government had to prove that the defendant joined the conspiracy intending to achieve that goal or objective and that he shared a unity of purpose towards that goal with another conspirator. Furthermore, the jury was instructed that the government had to prove that each defendant was consciously aware of the nature of his actions and the surrounding facts and circumstances as specified in the offense charged. The jury also had to find that the government had proven that the defendant knew his conduct was unlawful and intended to do something that the law forbids; that is he acted with a purpose to disobey or disregard the law. It is also worth reiterating that the jury was instructed that the

government had to prove that the defendant had entered into a conspiracy to commit premeditated murder.

The jury is deemed to have followed the instructions stated above.[5] *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). In light of the requirements that the jury was given with respect to a potential guilty finding of conspiracy to commit premeditated murder, there is no reasonable probability that the outcome would have been different had counsel requested a First Amendment jury instruction. As the instructions cited above make clear, the jury had to find that the defendants were not engaged merely in speech that encouraged others to commit violence and were not merely expressing their ideas regardless of their popularity. A guilty finding also would require the jury to reject any notion that defendants were merely associating with others to advance collective beliefs and to pursue a wide variety of objectives, including, but not limited to political, social, economic, educational, religious, and cultural goals. The in depth jury instructions adequately addressed petitioners' First Amendment concerns raised in their § 2255 motions because of what the jury was required to find in reaching a guilty verdict.

---

[5] It is also worth noting that the jury did not convict the Dukas of all of the charges against them. Indeed, the Dukas were found not guilty of Count II – attempting to murder members of the United States military and Eljvir Duka was found not guilty of possession or attempted possession of firearms in furtherance of the crimes charged in Count I and II. This illustrates that the jury was able to compartmentalize the evidence against the defendants. *See United States v. Jimenez,* 513 F.3d 62, 83 (3d Cir. 2008) ("The jury's verdict reflects that the jury was able to compartmentalize the evidence as to each defendant and each count as evidenced by the jury's acquittal on some counts and convictions on others."); *Park v. California,* 202 F.3d 1146, 1150 (9th Cir. 2000) ("[T]he failure of the jury's ability to convict on all counts is the best evidence of a jury's ability to compartmentalize the evidence.") (internal quotation marks and citations omitted); *United States v. Noske,* 117 F.3d 1053, 1057 (8th Cir. 1997) ("Acquittals of some defendants on some charges and a defendant charged only with count II show the jury was able to compartmentalize the evidence.").

The Court finds the Ninth Circuit's decision in *United States v. Giese*, 597 F.2d 1170 (9th Cir. 1979) instructive on this issue. In *Giese*, the defendant and his co-conspirators were vehemently opposed to the Vietnam War and were charged with conspiracy to bomb an Army recruiting station amongst other charges. *See id.* at 1175-76. One of the issues that Giese raised on appeal was that:

> the inherent nature of the case, aggravated by the government's introduction of evidence of his political beliefs and activities, made the conspiracy "bifarious," that is, one involving unlawful actions and constitutionally protected activities. Under these circumstances, he asserts, the court was required to give the jury special instructions cautioning it not to convict on the basis of First Amendment activities.

*Id.* at 1198. Ultimately, the Ninth Circuit found that the court's instructions sufficiently warned the jury that it could not convict Giese on the basis of legal conduct, such as peaceful opposition to the Vietnam War that was protected by the First Amendment. *See id.* The Ninth Circuit noted that the jury was instructed on the four material elements that were required to find that Giese had participated in the conspiracy; they were: (1) that the conspiracy existed; (2) that Giese willfully and knowingly became a member of the conspiracy with intent to further its objectives; (3) that the conspiracy formed by at least two persons was for the purpose alleged, "namely, to commit and cause to be committed, certain offenses against the United States and other persons and institutions by means of or acts of violence, terrorism and destruction. . ."; and (4) that during the conspiracy that one of the members willfully and knowingly committed at least one of the overt acts alleged. *See id.* It was based on these conspiracy instructions that the Ninth Circuit found no error. Indeed, that Court stated as follows:

> Although these instructions did not explicitly prohibit the jury's consideration of First Amendment activities, they did, by their very terms and logic, negate the relevance to the verdict of Giese's protected speech, association, and assembly. The jury could have

> convicted Giese only after finding that he "willfully and
> knowingly" joined a conspiracy formed to "commit and cause to
> be committed certain offenses against the United States and other
> persons and institutions by means of or acts of violence, terrorism
> and destruction." *Nothing could be clearer or less threatening to
> First Amendment values. After hearing these instructions, no
> reasonable juror could have found that Giese joined the
> conspiracy solely by expressing opposition to the Vietnam War. A
> more direct and purposeful manifestation of intent was required to
> find that he joined the conspiracy "willfully and knowingly."*

*Id.* (emphasis added).

As illustrated above, like the conspiracy instructions in *Giese*, this Court laid out the four elements that the government needed to prove for the jurors to find that the Dukas were guilty of conspiracy to murder members of the United States military. The jury was instructed that to find the Dukas guilty they had to find that they willfully and knowingly entered the conspiracy to murder members of the United States military.

Rather than being convicted simply for their speech, the government provided several acts that the Dukas undertook such that a First Amendment instruction would not have changed the outcome of their trial to a reasonable probability. Certainly, the Dukas words were important in placing their actions into context, but the evidence produced by the government included specific actions that the Dukas undertook to support a finding of a conspiracy. By way of example only, and with respect to the Dukas, this included paintball activities which the Dukas themselves classified as "training." It further included the purchase and collection of weapons. This included Dritan and Shain Duka purchasing AK-47s and M-16s from Omar. These acts could be considered in furtherance of the conspiracy.

Accordingly, in light of this Court's jury instructions that negated the possibility that the Dukas could be convicted based on their protected speech as well as the evidence produced at trial, this Court finds that the Dukas are not entitled to relief on Claim II.

C.  Claim III – Failure to Object to Expert Testimony

In Claim III, the Dukas assert that their trial counsel was ineffective when they failed to object to the expert testimony of Evan Kohlmann and that appellate counsel was ineffective for failing to raise this issue on appeal. Mr. Kohlmann was qualified as an expert in the fields of Islamic terrorism and the use of digital media to promote terrorism without objection. He testified with respect to videos that were found on Shnewer's computer as well as some videos that were found on Eljvir's computer. He also reviewed the recordings of the Dukas associated with the viewings of some of those videos. The Dukas' main challenge to Kohlmann's testimony is from his answer to a hypothetical posed to him by the Assistant United States Attorney during direct:

> Q:  Mr. Kohlmann, based on your expertise a small group of individuals that possess the type of videos you reviewed from the Shnewer and Duka computers, if one of that group had surveilled a potential target, one or more of that group had acquired a map of a potential target, if members of the group had engaged in tactical training, if members of the group had engaged in firearms training, if members of the group were then attempting to acquire AK-47s and M-16s, based on your training and experience would these factors be consistent with a domestic terrorist act, preparation for a domestic terrorist act?
>
> A:  To my mind the factors that you just ticked off one after the other represent to me pretty clear signs that you are dealing with a recipe for disaster. I mean, one or more of these things, if someone just has jihadi videos on their computer on they're just engaged in firearms training or they've just said one or two things, that alone, you know, that doesn't spell a terrorist act. But when have you all of these things together in my mind that really is a clear consider and present danger to the community.
> And while it's tough to assess people until they actually carry out a real terrorist attack, how sophisticated they are, I think one of the things I've learned in studying home-grown terrorist cases is it doesn't take a lot of sophistication to kill people. Ultimately, it comes down to intent. And if you have a very strong intent and you have the tools necessary to kill people, it doesn't take a lot of thought or preplanning to really cause chaos. I think if you look at

what happened in Mumbey recently, if you look again, I gave the
incident – I gave the description of Glasgow in Scotland, guys that
have very simple weapons and a very simple plan can cause a lot
of trouble. And at least in my mind, knowing what's in those
videos and seeing what the impact is of the videos on the people
that watched them along with the tactical reconnaissance, along
with having the automatic weapons, that is a very serious risk to
the community in my assessment.

(Trial Tr. at p. 5888-89.)

The Dukas assert that Kohlmann "testified that a conspiracy in this case existed and that

the group in fact intended to commit a terrorist act." (Dkt. No. 13 at p. 58.) They claim that

admission of Kohlmann's opinion was prejudicial to them because the primary issue for the jury

to determine was intent, "i.e. whether they actually agreed to murder United States military

personnel or whether they only engaged in militant talk." (Dkt. No. 13 at p. 62.)

It is true that "[i]n a criminal case, an expert witness must not state an opinion about

whether the defendant did or did not have a mental state or condition that constitutes an element

of the crime charged or of a defense." FED. R. EVID. 704(b). However, under Federal Rule of

Evidence 704(b), "'expert testimony is admissible if it merely supports an inference or

conclusion that the defendant did or did not have the requisite mens rea, so long as the expert

does not draw the ultimate inference or conclusion for the jury and the ultimate inference or

conclusion does not necessarily follow from the testimony.'" *United States v. Hayward*, 359 F.3d

631, 636 (3d Cir. 2004) (citing *United States v. Bennett*, 161 F.3d 171, 185 (3d Cir. 1998)

(quoting *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997))).

In this case, Kohlmann's testimony was admissible as it did not draw the ultimate

inference or conclusion for the jury and therefore did not run afoul of Rule 704(b). The

questioning of an expert using a hypothetical drawn from facts in the case does not run afoul of

Rule 704(b). For example, in *United States v. Davis*, 397 F.3d 173, 179 (3d Cir. 2005), the Third

Circuit analyzed a claim of whether an expert's testimony violated Rule 704(b). In finding that

the District Court did not abuse its discretion in admitting the expert's testimony, the Third

Circuit stated as follows:

> Defendants argue that by allowing Officer Garner to testify that
> their possession under the circumstances was "consistent" with
> "intent to distribute," the District Court permitted a violation of
> Fed.R.Evid. 704(b). They rely on our opinion in [*United States v.*]
> *Watson* [260 F.3d 301 (3d Cir. 2001)] where we held that the
> expert's testimony regarding the defendant's intent violated Rule
> 704(b). In this case, unlike in *Watson* where the government's
> questions were "plainly designed to elicit the expert's testimony
> about the mental state of the defendant," 260 F.3d at 309, Officer
> Garner's testimony was given in response to hypothetical, rather
> than specific, questions regarding the intent of individual
> defendants on trial. Although the District Court noted that the
> hypothetical presented to Officer Garner closely resembled the
> circumstances of this particular case, unlike in *Watson* "the
> government did not repeatedly refer to the individual defendant's
> state of mind when questioning the government expert." *Davis,*
> 233 F.Supp.2d at 703. In addition, no evidence was presented that
> Officer Garner had any direct relationship with the investigation or
> the defendants and, therefore, there was no potential for the jury to
> conclude that Officer Garner had any special insight into the
> thoughts or intent of the defendants. Consequently, the District
> Court did not abuse its discretion in finding that Officer Garner's
> testimony did not violate Fed. R. Evid. 704(b).

*Davis*, 397 F.3d at 179. As in *Davis*, Kohlmann's testimony was in response to a hypothetical

and there was no evidence that he had any direct relationship with the Dukas, Shnewer or Tatar,

or the investigation that would have given him special insight into their thoughts or intent.

Therefore, Kohlmann's testimony did not run afoul of Rule 704(b).

Recently, panels of the Third Circuit have reiterated the holding in *Davis* (albeit in non-

precedential decisions). For example, in *United States v. Coles*, 558 F. App'x 173, 183-84 (3d

Cir. 2014), a panel of the Third Circuit analyzed whether the admission of the expert testimony's

constituted plain error in a drug case. More specifically, the panel in *Coles* found that such

testimony did not constitute plain error. In *Coles*, the Third Circuit panel explained its reasoning as follows:

> [T]he Government asked the expert to assume the key facts concerning drugs and drug paraphernalia that were recovered from a car that Morris had been seen driving. In response to the Government's question as to whether the type and quantity of drugs and drug paraphernalia were "consistent with drug trafficking or . . . . simple possession," the expert responded, "It would be my opinion that would be possession with intent to deliver the narcotics." This testimony did not violate Federal Rule of Evidence 704(b) because it responded to a hypothetical question and did not involve the government's "repeated[ ] refer[ence] to the individual defendant's state of mind when questioning the government's expert."

*Coles*, 558 F. App'x at 184 (quoting *Davis*, 397 F.3d at 179) (other citation omitted).

A different panel of the Third Circuit was presented with a similar issue in *United States v. Ramirez*, 249 F. App'x 277 (3d Cir. 2007), which involved a conviction for possessing a firearm in furtherance of a drug trafficking crime. That panel cited to the Third Circuit's precedential opinion in *Davis* to find that the District Court did not err in admitting an expert's testimony. More specifically, the panel stated in *Ramirez* that:

> In *United States v. Davis*, 397 F.3d 173 (3d Cir. 2005), for example, the Government posed a hypothetical question similar to the one asked in the instant case. The expert witness in *Davis* was asked "whether, assuming that 'five persons were in a car, four of whom possessed handguns,' and that 'one person possessed a handgun with 12 packets, another person possessed a handgun with 19 packets, [and] one person ... possessed a handgun with 44 packets,' 'would you say that would be consistent with drug trafficking or consistent with possession, simple possession.'" *Id.* at 177. He responded that such behavior was consistent with "possession with intent to deliver the narcotics." *Id.* Although this hypothetical question closely mirrored the facts of the defendant's case, we determined that it was not an error to admit the testimony under either Rule 702 or Rule 704 because the "testimony was given in response to hypothetical, rather than specific, questions regarding the intent of individual defendants on trial." *Id.* at 179.

> The testimony admitted in the instant case is no different.
> Detective Ator was asked a hypothetical question that closely
> mirrored the facts of Ramirez's case, and he answered that his
> experience tended to suggest that such a situation was consistent
> with the possession of a firearm in furtherance of a drug trafficking
> crime. Because the testimony involved hypothetical, rather than
> specific, questions, the District Court did not err by admitting it.

*Ramirez*, 249 F. App'x at 281 (footnote omitted).

The Court also finds that *United States v. Romero*, 189 F.3d 576 (7th Cir. 1999) is instructive and persuasive on this issue. In *Romero*, Lanning, an expert on child molesters testified. On redirect, "[t]he prosecution posed a series of hypothetical actions to Lanning and asked him if these actions would indicate someone who would act on his sexual fantasies about children. Not surprisingly, the hypotheticals described actions taken by Romero that had already been produced in evidence[.]" *Id.* at 584. Ultimately, the Seventh Circuit held that while Lanning's redirect testimony addressed some of Romero's actions in the form of hypotheticals, Lanning never opined as to the defendant's mental state such that his testimony did not amount to a statement of his belief about what specifically was going through the defendant's mind. *See id.* at 586.

The hypothetical answered by Kohlmann did not opine on the Dukas' mental state and did not run afoul of Rule 704(b) because it did not involve the government's repeated reference to the Dukas' state of mind. Instead, Kohlmann responded to a hypothetical that closely mirrored the facts presented in the case. This is permissible based on the cases cited above. Furthermore, Kohlmann was not involved in the investigation of the Dukas nor did he have any direct relationship with them. Therefore, trial counsel's failure to object at trial and appellate counsel's failure to raise this issue on appeal does not warrant granting the Duka's relief. Their trial counsel were not ineffective in not objecting to his testimony because it was properly admitted.

The Dukas also argue that their counsel should have objected to Kohlmann's testimony because there was no opportunity for this Court to analyze whether his theories had been tested, subjected to peer review, had achieved general acceptance in the social science community or was based upon a reliable methodology. The Dukas argue that counsel's failure to object runs afoul of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Rule 702 states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

> A trial court should consider several factors in evaluating whether a particular methodology is reliable. These factors, enunciated in *Daubert* and this Court's decision in *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985), may include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Paoli,* 35 F.3d at 742 n. 8.
>
> The factors drawn from *Daubert* and *Downing,* however, "are neither exhaustive nor applicable in every case." *Kannankeril* [*v. Terminix Intern., Inc.*], 128 F.3d [802,] 806–07 [(3d Cir. 1997)]; *see also Kumho Tire* [*Co. v. Carmichael*]*,* 526 U.S. [137,] 151, 119 S. Ct. 1167 [(1999)] (noting that *Daubert* itself "made clear that its list of factors was meant to be helpful, not definitive"); *Milanowicz*

> *v. The Raymond Corp.,* 148 F. Supp. 2d 525, 536 (D.N.J. 2001)
> (reconfiguring *Daubert* for application to "technical" or "other
> specialized" subjects such as engineering and identifying several
> factors for trial courts to consider in evaluating reliability,
> including relevant literature, evidence of industry practice, and
> product design and accident history). "The inquiry envisioned by
> Rule 702 is ... a flexible one." *Daubert,* 509 U.S. at 594, 113 S.Ct.
> 2786.

*Pineda v. Ford Motor Co.,* 520 F.3d 237, 247-48 (3d Cir. 2008).

This Court heard testimony from Kohlmann himself before it permitted Kohlmann to

testify as an expert in the field of Islamic terrorism and the use of digital media to promote

terrorism. Kohlmann's testimony included his credentials which included:  (1) his graduate

studies at Georgetown University; (2) his employment as an international terrorism consultant

where he specializes in the use of on-line technology by Al-Qaeda and Al-Qaeda affiliate

programs; (3) his operation of globalterroralert.com, which is a clearing house for academics,

policy makers and law enforcement to provide raw materials that go into investigations of

terrorism and terrorist related acts along with analysis; (4) authoring a book entitled *Al-Qaeda's

Jihad* in 2004 which has been used as a graduate level textbook at the Harvard School of

Government and at the Johns Hopkins School of Advanced International Studies; and (5)

researching Al-Qaeda and Al-Qaeda affiliates since 1997 which includes primary and  secondary

research.[6]

Kohlmann also testified that he has become familiar with the role of computers and

digital media in spreading terrorist propaganda; more specifically, he testified that:

> [a]s a function of conducting research in this field, one of the areas
> which I focused most on in the last few years has been the use of
> the internet and the use of electronic technologies in order to

---

[6] Primary research was defined by Kohlmann as speaking directly to representatives of terrorist
organizations and seeing training camps. Kohlmann testified that an example of a secondary
source would be a magazine issued by a terrorist organization as well as a communique, an audio
or visual recording.

> surveil communications, in order to study how organizations work, recruitment, propaganda, and essentially to try to use that information then in a counterterrorism way as opposed to a pro terrorism way.

(Trial Tr. at p. 5827.) Finally, Mr. Kohlmann testified that he previously testified eleven times in federal court in the general field of Islamic terrorism and the use of digital media to promote terrorism eleven times, as well as in U.S. military and foreign courts. (*See id.* at p. 5927-28.)

The Dukas have not shown that they are entitled to relief on this issue because an objection to Kohlmann being classified as an expert on Islamic terrorism would have been denied. Indeed, Kohlmann has testified as an expert in federal cases several times and his methodology has been approved by several courts. *See United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2014) (finding that the district court did not abuse its discretion in deciding Kohlmann's evidence satisfied Rule 702 because the court heard testimony on his credentials and techniques and was convinced that he possessed the knowledge, skill, experience, training and education to testify on various aspects of decentralized terrorism and homegrown terrorism); *United States v. Farhane*, 634 F.3d 127, 159 n.32 (2d Cir. 2011) (noting that Kohlmann has been qualified as an expert on terrorism in a number of federal prosecutions) (citing *United States v. Benkahla*, 530 F.3d 300, 309 n.2 (4th Cir. 2008); *United States v. Aref*, 285 F. App'x 784, 792 (2d Cir. 2008); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 446 (E.D.N.Y. 2013) ("[T]he court finds Kohlmann is qualified as a terrorism expert and that his methodology is sufficiently reliable. Among other things, he is the author of a textbook on terrorism that is used in graduate level courses at Harvard University's Kennedy School of Government and Princeton University, and oversees one of the largest digital collections of terrorist multimedia and propaganda in the world. Notably, Kohlmann has testified as an expert in sixteen cases in federal courts and before the Guantanamo Bay military commissions. Moreover, his research and

archival methodology appear to be consistent with those in the terrorist field, as other courts have recognized.") (internal citations and other citations omitted); *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 366 (D. Conn. 2009); *United States v. Kassir*, Crim. No. 04-356, 2009 WL 910767, at *7 (S.D.N.Y. Apr. 2, 2009)); *United States v. Paracha*, Crim. No. 03-1197, 2006 WL 12768, at  *20 (S.D.N.Y. Jan. 3, 2006) ("Whatever the general pitfalls of the 'vetting process' that is employed by Kohlmann and others in his field, it is a sufficiently reliable methodology to meet the requirements of Fed. R. Evid. 702.") (citation omitted).

Finally, the Dukas argue that "Kohlmann accepted evidence provided by the Government as true, without any scrutiny, analysis, or comparison with other independent sources." (Dkt. No. 13 at p. 61.) The problem with this argument is that the Dukas do not identify any facts presented in the hypothetical posted to Kohlmann that were unsupported by trial evidence. As previously stated, such a hypothetical did not run afoul of the Federal Rules of Evidence.

Accordingly, the Dukas fail to show that they are entitled to relief on Claim III.

D.  Claim IV – Failure to Request Juror Voir Dire after Juror Reaction

In Claim IV, the Dukas assert that their trial counsel were ineffective in failing to request that the Court conduct voir dire on a juror during trial based on the reaction of one of the jurors to evidence produced at trial. According to the Dukas:

> During the trial, the government played videos found on Mohammed Shnewer's computer that were viewed by some of the petitioners. Among the videos shown were ones depicting beheadings and another depicting a U.S. soldier having his arm blown off. Following the videos there was a recess. The defendants observed a female juror identified as juror #3 slam her evidence binder shut and glare angrily at the defendants. During *voir dire* it was disclosed that juror #3 had a son in Iraq . . . . Each of the Dukas reported his observations to the attorneys. However, the attorneys did not bring the matter to the attention of the Court. Nor did they make a record of the juror's reaction.

(Dkt. No. 13 at p. 63.)

Dritan Duka's trial attorney, Mr. Huff, does not recall a particular incident where a juror had a visible emotional reaction to the playing of a particular video at trial. (*See* Dkt. No. 31-1 at p. 11.) Mr. Huff states that he knew the jurors would likely have a strong reaction to the videos, but that those reactions were inevitable because this Court did not exclude them at trial. (*See id.*) Mr. Huff further states that he has no reason to believe that in response to any questioning from that Court, that any jurors would have stated that they could not remain fair and impartial. (*See id.* at p. 12.) Mr. Huff states that it has been his experience that most people who have been subjected to voir dire and selected for jury service believe they are fair and impartial and capable of following the judge's instructions. (*See id.*)

Eljvir Duka's trial attorney, Mr. Archie, recalls that when the videos were played during the trial that virtually all of the jurors appeared to be upset and shaken by violent images on the videos. (*See* Dkt. No. 31-1 at p. 21.) Like Mr. Huff, Mr. Archie states that it was inevitable that the jurors would be upset by the videos. (*See id.*) However, he does not recall any of the defendants bringing to his or any of the other attorneys attention of any reaction by a particular juror to the playing of the videos at trial. (*See id*.) Mr. Archie states that he does not believe that the defense would have benefited had the jurors been questioned about their emotional reactions to the videos and about whether they would continue to be fair and impartial towards the defendants after viewing the videos. (*See id.* at p. 22.)

Shain Duka's trial attorney, Mr. Riley, has a more specific recollection of juror reaction to the videos. Indeed, Mr. Riley states as follows in his declaration:

> I recall an incident during trial when Juror #4, a woman whose son was wounded while serving in the United States military in Afghanistan, appeared to react visibly after viewing a jihadist

video that had been admitted into evidence, which showed
American soldiers being severely wounded in Iraq or Afghanistan.

For tactical reasons, I did not request that the trial judge take an
action in response to the juror's reaction.

I believed that any effort to have the judge question the juror about
her reaction to the video would not have caused the judge to
remove the juror.

Additionally, I thought that questioning the juror about her reaction
to the video would have given additional emphasis and weight to
the video in the mind of the juror, and might have also caused that
juror, and perhaps others, to react negatively towards the defense.

(Dkt. No. 31-1 at p. 30.)

"Under *Strickland*, a federal habeas court 'must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance." *Jacobs v.

Horn*, 395 F.3d 92, 118 (3d Cir. 2005) (citing *Strickland*, 466 U.S. at 689). "The [petitioner]

bears the burden of overcoming the presumption that 'the challenged action might be considered

sound trial strategy.'" *Id.* (citing *Strickland*, 395 F.3d at 118).

The Dukas have not made a showing necessary to show that the actions of their trial

counsel fell below an objective standard of reasonableness. As Mr. Riley's declaration makes

clear, a sound trial strategy existed for not requesting that this Court conduct voir dire of the jury

in light of their reaction to viewing the videos. Mr. Riley explained that he had specific tactical

reasons for not requesting that this Court take any action with respect to a juror's reaction to

viewing the videos. Specifically, Mr. Riley was concerned that any questioning would place

additional emphasis and weight on the video and perhaps have caused that juror (and potentially

others) to react negatively towards the defense.

While not directly analogous to the circumstances giving rise to Claim IV, in *Jacobs*, the

Third Circuit had to analyze whether counsel's failure to inquire during voir dire of prospective

jurors about racial bias amounted to ineffective assistance of counsel. The Third Circuit noted that had counsel requested voir dire with respect to racial prejudice that the trial court would have been constitutionally bound to grant his request. *See Jacobs*, 395 F.3d at 118. Nevertheless, the Third Circuit explained that the petitioner failed to show that he was entitled to federal habeas relief because;

> Counsel could have believed that probing the jurors' potential racial prejudices might unduly emphasize the racial differences, somehow inject racial issues into a trial where none existed, or taint the jurors' view of Jacobs and his attorney. In other words, counsel reasonably could have concluded that asking questions about racial prejudice would do more harm than good. Under these circumstances, and in the absence of any evidence to the contrary, we presume that counsel's decision was sound trial strategy.

*Id.*

In this case, Mr. Riley felt that asking about the jurors' reaction to the videos would do more harm than good as it would have placed additional emphasis on the videos. This Court finds that Shain Duka has failed to overcome the presumption that Mr. Riley's decision was anything but sound trial strategy. Thus, Shian Duka has failed to show that he is entitled to federal habeas relief on this claim as he has not shown that he satisfies the first prong of the *Strickland* test.

The analysis with respect to Dritan and Eljvir Duka in Claim IV produces the same result. Mr. Archie specifically recalled that the jurors were upset and shaken by the images of the videos played at trial. Mr. Archie states that it was inevitable that the jurors would have been upset by the videos and he was not surprised to see that many of them were after the defense unsuccessfully moved to exclude them. Nevertheless, he also stated that he thought the defense would not benefit from having this Court question the jurors about their emotional reactions to the videos and about whether they would continue to be fair and impartial towards the defedants.

This Court finds that Eljvir Duka fails to show that Mr. Archie's performance in failing to seek voir dire fell below an objective standard of reasonableness. Mr. Archie admits that it was inevitable that the jurors would be upset and that he was aware of the jurors' reactions to the videos. Thus, the purported reaction by one juror was something that was expected by the attorneys after the videos were not excluded by this Court.[7] Therefore, Eljvir Duka is also not entitled to relief on this claim.

Finally, Dritan Duka's attorney, Mr. Huff did not recall a particular incident where a juror had a visible emotional reaction to the playing of the videos. However, like Mr. Archie, after having unsuccessfully moving to exclude the videos, Mr. Huff recognized that the jurors would likely have an inevitable emotional reaction to those videos. Mr. Huff states that he did not consider asking the trial judge to voir dire the jurors during the trial because it was his belief that he thought the jurors would be fair and impartial and able to follow the court's instructions. Mr. Huff was clearly aware of the potential impact that the videos could have on the jury yet decided, as a matter of trial strategy not to have the Court inquire further. This Court finds that Dritan Duka has also failed to show that Mr. Huff's failure to object fell below an objective standard of reasonableness.

The Dukas have also failed to show the level of prejudice necessary to warrant granting them relief on this claim. First, this Court cautioned the jury during its instructions as to their use of the videos in arriving at a verdict by stating:

> [T]he videos recovered from defendant's computer was introduced
> into evidence by the government to demonstrate motive and intent.
> Some were not pleasant videos to look at. You should not let them
> stir up your emotions to the prejudice of the defendants. Your
> verdict must be based on a rational, fair and impartial
> consideration of all the evidence and not on passion or prejudice

---

[7] The Third Circuit affirmed the admission of these videos on the Dukas' direct appeal. *See Duka*, 671 F.3d at 351-52.

> against the defendants, the Government or anyone else connected
> with this case.

(Trial Tr. at p. 6283-84.) The jury is presumed to have followed these instructions, *see Weeks*,

528 U.S. at 234, such that any potential bias or prejudice produced by the videos was alleviated

by this Court's cautionary instruction. Furthermore, any potential bias or prejudice on the part of

the juror in question is completely speculative. This Court cannot say that had counsel requested

voir dire, that the result of their trial would have been different to a reasonable probability. *See*

*Palmer v. United States*, 46 F. App'x 5, 8 (1st Cir. 2002) (unpublished) (where claim of juror

bias is highly speculative, it is unlikely that failure to raise the issue affected the outcome of the

trial); *Evans v. Luoma*, No. 05-72726, 2007 WL 128925, at *4 (E.D. Mich. Jan. 12, 2007)

(counsel's failure to raise issue of juror bias did not prejudice petitioner where it is highly

speculative). As this Court noted in *supra* note 5, the jury acquitted all of the Dukas of Count II

and Eljvir Duka of Count III thereby illustrating that they were able to compartmentalize the

evidence against the defendants as it related to each specific count.

Accordingly, for these reasons, the Dukas are not entitled to relief on Claim IV.

E.  Claim V – Failure to Argue that Conversation was Admissible Under Federal Rule of
    Civil Procedure 803(3)

Dritan Duka argues that appellate counsel was ineffective for failing to argue on appeal

that conversations he had with Besnik Bakalli in April, 2007 should have been admitted under

Federal Rule of Evidence 803(3). That rule states as follows:

> **Then-Existing Mental, Emotional, or Physical Condition.** A
> statement of the declarant's then-existing state of mind (such as
> motive, intent, or plan) or emotional, sensory, or physical
> condition (such as mental feeling, pain, or bodily health), but not
> including a statement of memory or belief to prove the fact
> remembered or believed unless it relates to the validity or terms of
> the declarant's will.

FED. R. EVID. 803(3). "The rule is now firmly established that '[t]here are times when a state of mind, if relevant, may be proved by contemporaneous declarations of feeling or intent.'" *United States v. Hernandez*, 176 F.3d 719, 726-27 (3d Cir. 1999) (quoting *Shepard v. United States*, 290 U.S. 96 (1933)). "However, the scope of this exception must be limited to prevent it from devouring the rule. Thus, '[s]tatements that are considered under . . . the 'state of mind' exception, cannot be offered to prove the truth of the underlying facts asserted.'" *Id.* at 727 (quoting *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1274 (3d Cir. 1995)) (other citation omitted). "In determining whether statements relative to the declarant's state of mind are admissible under Fed. R. Evid. 803(3), three requirements must be satisfied: (1) the statements must be contemporaneous with the . . . event sought to be proven; (2) it must be shown that the declarant had no chance to reflect – that is, no time to fabricate or misrepresent his thoughts; and (3) the statements must be shown to be relevant to an issue in the case." *United States v. Jackson*, 780 F.2d 1305, 1315 (7th Cir. 1986) (internal quotation marks and citations omitted); *see also Reppert v. Marino*, 259 F. App'x 481, 490 (3d Cir. 2007) (stating to be admissible under 803(3) hearsay exception, declaration must "contemporaneously evidence the declarant's mental state, and declarant's state of mind must be relevant to the case") (citing *Hernandez*, 176 F.3d 719; *Prather v. Prather*, 650 F.2d 88 (5th Cir. 1981)); 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 803.05[2][a] (to be admissible under state of mind exception to hearsay, "[t]here must be no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his or her thoughts.").

Dritan Duka argues that his statements to Bakalli in April, 2007 evidenced intent not to engage in acts of violence. Dritan Duka points to the following statements he made to Bakalli in April, 2007 to support his argument:

> It's very hard brother. It's very hard. If you try and help the Muslims, they call you a terrorist. It's very bad. You are afraid to even give money, brother. To help children and the ones that, that are suffering. . . If you send, you send money where they are killing, you are a terro. . . you give (U/I) to the terrorists. . . . They nail you, you can't do nothing. Nowadays if you say something. . . that's why I often tell people, 'Be careful what you say'. . . .
> Because they put you in jail for no reason, man. . . for no reason. You say something. In jail. For what? You haven't had it in your mind to do anything you're raising your family, 'poop' they nail you thirty (30) forty (40) years in jail. For no reasons, just words. It's not worth it. Especially with the government we have, it's better to keep it withing. [sic] [Y]ou got to be careful what you say. . . .
> We, like we are, things are not the way they should be, let alone if they put us in jail. What will the children do then. . . .
> [C]ause in jail . . . the father in jail. Alive. It's another thing when you died. But the father alive. . . For what? To go to jail for word? Forget it. You lose your mind. . . .
> We are in their county, what can you do? We can't do anything in our country. Even there they nail you, they put you in jail, let alon[e] here. . . .
> We can't . . . we . . . the biggest Jihad for us here in America is to spread Islam. Just like we did with Rasha, with others. The is the most important thing. That is war, believe me. That is Jihad. Jihad is not just, like we say, to go fight. No. People misunderstand it. . . . The first Jihad is with yourself when the devil tells you, do this, you try, you fight with the devil. No, no, no, I won't do it, I won't do it. Then the second Jihad is with your family. To work. To teach Islam to your children. Then you should spread Islamin, to tell others, this is Islam. The one with war is ehh. . . the last one that one. Like they say, that one is smaller, the bigger ones are like this. . . .
> Stay quiet. Don't do anything. Do the dauah (Muslim ritual), show people how Islam is. That's it. Otherwise forget it.

(Dkt. No. 17-2 at p. 91-93 & 102.) Dritan asserts that his "stated belief that violent *jihad* was impractical if not impossible within the United States and that his duty was to spread Islam and

raise his family was made at the very time the government maintain[s] he was a member of a conspiracy whose stated aim was the murder of U.S. soldiers. Thus, it was admissible to show that he lacked the intent to commit the crime." (Dkt. No. 13 at p. 70.)

Analysis of this ineffective assistance of appellate counsel claim begins with a presumption that counsel's actions are reasonable. *See Strickland*, 466 U.S. at 689. If a claim is not meritorious, then failure to raise the issue on appeal does not constitute ineffective assistance of counsel. *See United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000). Furthermore, appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). Within these constraints, the Supreme Court has held that it is difficult to prove that a lawyer's failure to raise a particular claim on appeal constitutes ineffective assistance of counsel. *See id.*; *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (rejecting *per se* rule that appellate counsel must raise every nonfrivolous issue); *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) ("[A]s a general matter, it is not inappropriate for counsel, after consultation with the client, to override the wishes of the client when exercising professional judgment regarding [appealing] 'non-fundamental' issues.") Indeed, an exercise of professional judgment is required because appealing losing issues "'runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions.'" *Id.* (citing *Jones*, 463 U.S. at 753).

The government submitted a declaration from Dritan Duka's counsel, Mr. Huff. Mr. Huff states in his declaration that he decided in his professional judgment on appeal that the best chance for the Third Circuit to overrule this Court's exclusion of the recording and grant a new trial was by presenting only that the evidence should be admitted under the rule of completeness.

He also states that he used his professional judgment to decide to file a joint appellate brief with the other defendants because it would more likely focus the attention of the appellate judges on the strongest defense claims of the defendants rather than individual briefs. (*See* Dkt. No. 31-1 at p. 10.) Mr. Huff states that he believed that the rule of completeness was a stronger basis for the admission of the recording as opposed to the existing mental condition exception to the hearsay rule. (*See id.* at p. 11.)

This Court finds that Dritan Duka has failed to overcome the presumption that Mr. Huff's actions were reasonable. As Mr. Huff explains in his declaration, he used his professional judgment in determining that a joint appellate brief would be better for Dritan Duka. Furthermore, he used his professional judgment to focus on the rule of completeness argument as opposed to the state of mind exception to argue that the statements should have been admitted at trial. Accordingly, Mr. Huff's tactical decision to omit the state of mind argument on appeal did not fall below an objective standard of reasonableness and this Court will not second-guess that decision.

Nevertheless, even if Dritan Duka could somehow show that Mr. Huff's decision to not appeal whether the statements should have been admitted under the state of mind exception to hearsay fell below an objective standard of reasonableness, he still would have to show that there would have been a different outcome (to a reasonable probability) had Mr. Huff raised this issue on appeal.

As described above, to satisfy Rule 803(3) for admission, a party must show that the statements are contemporaneous with the event sought to be proven and that the declarant had no time to reflect so that he could fabricate his thoughts. *See Jackson*, 780 F.2d at 1315. As the government notes in its brief, Dritan Duka expressed concern about "being careful" to Bakalli in

March, 2007 for fear that he was potentially an FBI agent. (*See* Government's Trial Exhibit ("GX") 856-B at p. 8 (But you got to be careful. Cause maybe you're an FBI, how can I know?).) Thus, by April 27, 2007, there were potential circumstances in play to suggest a motive for Dritan to misrepresent his state of mind. *See United States v. Naiden*, 424 F.3d 718, 722-23 (11th Cir. 2005) ("[T]he passage of time may prompt someone to make a deliberate misrepresentation of a former state of mind."); *United States v. Macey*, 8 F.3d 462, 567-68 (7th Cir. 1993) (statement made by defendant to employee four hours after directing her to prepare alleged false invoices was inadmissible under Rule 803(3) because "the district court could have concluded that Macey had time to fabricate a story in the four hours between his fraud and his statement to [the employee]."). Indeed, as this Court properly determined in denying the April 27, 2007 statements of Dritan Duka into evidence under Rule 803(3):

> The statement, it's not describing his contemporaneous feelings, it's describing how he reacted or how he now says he reacted to something he heard before . . . [T]hat's exactly what the rule is designed to prevent, which is to give someone time to reflect and then talk about it. That's why it admits the state of mind, the contemporaneous expression and state of mind because there's no time to reflect, and therefore we assume it's truthful. If you give him a day or two to talk about well, you know, I was thinking – well, that's what I was thinking then then it kind of defeats the purpose of the rule.

(Trial Tr. at p. 5556.) Therefore, Dritan Duka cannot show he was prejudiced by appellate counsel's failure to raise this issue on appeal as the evidence was properly excluded by this Court under Rule 803(3).

Dritan Duka has also failed to show prejudice for another reason. "In determining prejudice, 'a court hearing an ineffective assistance of counsel claim must consider the totality of the evidence before the judge and jury.'" *United States v. Travillion*, 759 F.3d 281, 290 (3d Cir. 2014) (quoting *Strickland*, 466 U.S. at 695)); *see also Gooding v. Wynder*, 459 F. App'x 83, 86

(3d Cir. 2012) (finding that court must consider strength of the evidence of a petitioner's guilt in determining whether he was prejudiced due to counsel's purported ineffectiveness) (citing *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999)). The case against Dritan Duka was not a weak case such that even if Mr. Huff should have made a Rule 803(3) argument on appeal, Dritan Duka was not prejudiced.

Indeed, the record is replete with instances of recorded conversations illustrating Dritan's intent such that the introduction of his April 27, 2007 statements would not have changed the result of the proceedings to a reasonable probability. By way of example only:

- On August 4-5, 2006 Dritan Duka, Shian Duka, Mohammed Shnewer and Mahmoud Omar went on a fishing trip whereby Dritan stated, "People like me and you we have we have no education. We don't know, only we know right from wrong. I think best thing for us is to go fight jihad. To die is better. Better we die man cause this life is fucked up." (*See* GX 607-B at p. 3.)

- On Marcy 9, 2007, Dritan Duka stated as follows, "Whoever comes against you, you kill them. The other people who don't do nothing you understand? Allah [God] said this religion has to prevail and you have to spread it with a sword until it prevails all over the world. Doesn't mean you only kill those that come at you, that's it. Whoever is, even if these guys say, say I'm against it [noise] kill him, he is against it, cause he's gonna be a burden." (*See* GX 853-B at p. 8.)

- On March 10, 2007, in speaking to Bakalli, Dritan Duka stated that, 'We have nothing here, because I would fuck their mothers, I'm going to start something. . . . We have no access to getting arms, you can't go there with a handgun. . . . We would need this, RPG's . . . . That finishes the job. . . . Because we have enough people. We are seven of

us, we are stupid and that's what we need, we have to be stupid. . . . You must love your

religion and be stupid. . . . See, every one of us that's involved is stupid, we are not

normal. . . . You're not normal, I'm not normal." (GX 854-B at p. 4.)

Subsequently, in May 7, 2007, after Dritan Duka's April 27, 2007 statements showing that he

purportedly had no intent to kill, Dritan Duka, along with his brother, Shain Duka, met Omar at

his resident to purchase four fully automatic M-16 machine guns and three semi-automatic AK-

47 assault rifles. In light of the other evidence produced against Dritan Duka at trial, this Court

finds that even if his April 27, 2007 statements should have been admitted under Rule 803(3),

Dritan Duka has failed to show prejudiced based upon the additional evidence implicating him in

the conspiracy.

Accordingly, for these reasons, Dritan Duka has failed to show that he is entitled to relief

under Claim V.

F.   Claim VI – Failure to Request a Hearing on a Missing Recording

In Claim VI, the Dukas argue that their respective trial counsel was ineffective for failing

to request a hearing on a missing recording. More specifically, the Dukas claim that FBI 302

#349 states that on April 21, 2007, Bakalli joined the Dukas for paintball. Bakalli was equipped

with a body recorder that day. (*See* Dkt. No. 17-1.) The Dukas explain they told their counsel

during that paintball game that Bakalli referred to paintball as good military training but that they

laughed at him and referred to it as a game. The Dukas state that this conversation does not

appear on the recordings produced by the government. (*See* Dkt. No. 14 at p. 64.)

The Dukas claim that counsel should have made a specific request for the recording, and

that if it was not produced by the government, the Dukas assert that counsel should have

requested a hearing on the issue. They claim that, "[g]iven how much the government

emphasized paintball as 'training' for *jihad*, counsel's failure to pursue this potentially exculpatory evidence was conduct falling below professional norms and prejudiced the petitioners." (*Id.* at p. 65.)

The government states in its answer that it has copies of the audiotapes between Bakalli and the Dukas on April 21, 2007, but that none of the recordings have been transcribed. The government explains that the recordings are largely in another language. While the government states that it has been unable to confirm that the Dukas' statements took place on April 21, 2007, it does not matter because even if such a statement was made, the Dukas have failed to show prejudice, i.e. that counsel's failure to request a hearing on this issue would have changed the result of their trial to a reasonable probability.

As the government notes, this was not a case where all of the Dukas' recorded statements to the cooperating witnesses over the course of the several months of taped recordings supported the charged crimes. This was made clear to the jury during the government's summation when the Assistant United States Attorney stated the following:

> They are friends, they've known each other for years. Of course they're going to have fun, of course they're going to clowning around from time to time. I mean they're still humans, but when they're paintballing as training, when they're shooting as training they have fun, but it's training nonetheless and that's their own words.

(Trial Tr. at p. 6418.) Indeed, the Dukas did speak about paintball as training in the record and transcribed statements. By way of example only:

- On February 26, 2007, Dritan Duka stated that he viewed paintball as training for jihad by stating:  "It's like a real war, brother. . . . In military they use this in U.S. army. . . . It's how they train you. . . . That's why we come, almost every day we come here you know. . . . I wanna be ready for Jihad [Holy Struggle] [OV] Insha' Allah [God willing]." (GX

635-B at p. 13. Subsequently, Shain Duka also stated that paintball was "good training." *Id.*

- On March 23, 2007, the Duka brothers discussed the value of paintball as training. (*See* GX 855-B at p. 15-17.)

Furthermore, the Dukas' statements that paintball was training was but one part of a larger case against them brought forth by the government. One statement by the Dukas that paintball was a game admitted into evidence would not have changed the result of the proceedings to a reasonable probability. Instead, there were other incriminating actions and statements of the Dukas such as (by way of example only) the wish to bring jihad to the United States, other statements that indicated that paintball was training and the purchase of firearms. Accordingly, the Dukas fail to show that they are entitled to relief on this claim.

G. <u>Claim VII – Failure to Introduce Video Recording</u>

In Claim VII, Eljvir Duka claims that his trial counsel, Mr. Archie, was ineffective when he failed to present a conversation Eljvir had with Bakalli on February 5, 2007 that they could not harm American soldiers on United States soil because they had done nothing wrong. Eljvir states that Mr. Archie mentioned this statement during his opening statement, but did not follow through with presenting it at trial. According to Eljvir, this statement went to the heart of the government's case against him and showed his lack of intent to harm United States soldiers within the United States. Eljvir states that Mr. Archie never sought to have it admitted during Bakallli's cross-examination or his own case, and that the statements were admissible under Federal Rule of Evidence 803(3) as the statements reflected his existing state of mind and intent.

During his opening statement, Mr. Archie did discuss a conversation the Dukas had in February, 2007, while in the Poconos. More specifically, Mr. Archie told the jury as follows:

> Now, they do talk, say some things. They do talk about Muslim
> oppression and then you have CW-2 in there who is miked up, he's
> in there trying to push buttons, he's talking about Jehad again,
> waging war. What does the Dukas talk about? They think it's okay
> if it's overseas and if it's to defend your religion and your family.
> He talks about why can't we do it here? You'll hear it on the tape,
> it's Horam. My client says overseas you are defending your
> religion and your family, yes over here, what did he do? What did
> he do, meaning what did the solider do? It's on the tape.

(Trial Tr. at p. 1620.) When Mr. Archie pressed this issue on Bakalli during cross-examination,

he could not recall Eljvir's supposed statement to him that it was "haram" or forbidden. (*See id.*

at p. 5693.) Eljvir argues that having failed to get his statements to Bakalli admitted on cross-

examination, Mr. Archie should have attempted to admit them under Federal Rule of Evidence

803(3).

Eljvir's trial counsel "cannot be deemed ineffective for failing to raise a meritless claim."

*Se Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) (citations omitted). As previously

described, Rule 803(3) permits a person to testify as to his then existing state of mind (such as

motive, intent or plan), or emotional, sensory, or physical condition, but does not permit a

statement of belief to prove the fact believed. *See* FED. R. EVID. 803(3)*; see also Wagner v. Cnty.

of Maricopa*, 747 F.3d 1048, 1052-53 (9th Cir. 2013) (Rule 803(3) bars statements as to what

declarant might have believed that would have induced the state of mind and applies when the

statements are offered to prove the truth of the fact of the underlying belief) (citations omitted);

*T. Harris Young & Assoc., Inc. v. Marquette Electronics, Inc.*, 931 F.3d 816, 828 (11th Cir.

1991) (stating that Rule 803(3) cannot be used to prove the fact believed because to hold

otherwise would amount to the virtual destruction of the hearsay rule); *New York v. Microsoft

Corp.*, No. 98-1233, 2002 WL 649951, at *3 (D.D.C. Apr. 12, 2002) (Rule 803(3) does not

permit evidence which is attempting to prove the truth of a belief).

The government states that no transcript of the February 5, 2007 recording has been made since neither side offered it into evidence at trial. The government asserts that it has listened to the recording and that it could not hear whether or not the statement was made. (*See* Dkt. No. 31 at p. 89.) Despite this lack of clarity as to whether in fact Eljvir made this statement to Bakalli, he is still not entitled to relief on this claim for the following reasons.

This Court will assume *arguendo* that Eljvir did in fact make a statement to Bakalli that they could not harm United States soldiers on American soil. However, Eljvir fails to show this statement would have been admissible under Rule 803(3). Indeed, it appears as if he is attempting to use Rule 803(3) to prove the truth of the underlying stated belief, specifically that he could not have conspired to commit murder of American soldiers in the United States because he had this belief. This amounts to Eljvir's attempt at an implied assertion which constitutes inadmissible hearsay. *See Hernandez*, 176 F.3d at 727 ("[S]tatements offered to support an implied assertion are inadmissdible hearsay.") (internal quotation marks and citations omitted). Accordingly, Eljvir Duka is not entitled to relief on this claim because counsel was not ineffective when he failed to seek to admit this evidence under Rule 803(3).

## VI.    CERTIFICATE OF APPEALABILTIY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327

(2003).  Applying this standard, the Court finds that a certificate of appealability shall not issue in this case on Claims II-VII. This Court reserves judgment on whether a certificate of appealability should issue on Claim I until after the evidentiary hearings on Claim I are completed and this Court issues its opinion on the merits on that claim.

## VII.   CONCLUSION

For the following reasons, Claims II-VII will be denied. The Court will conduct three separate evidentiary hearings (one for each of the Duka brothers) on Claim I. Appropriate Orders will be entered consistent with this Opinion.


DATED:  September 29, 2015

s/Robert B. Kugler
ROBERT B. KUGLER
United States District Judge
